[No. 1147.]

JAMES GOULD, RESPONDENT, *v.* ALEXANDER WISE, APPELLANT.

MECHANICS' LIEN—WHEN LESSEE CAN CREATE LIEN ON PROPERTY OF LESSOR.— The interest of the owner of reduction works may be subjected to lien claims, notwithstanding the labor and materials have not been performed and furnished at his instance if, knowing that alterations or repairs are being made, by the lessee, he fails to give notice that he will not be responsible therefor. (Stat. 1875, 123, sec. 9.)

IDEM—KNOWLEDGE OF OWNER—AGENT.—Evidence that the owner had an agent, residing in the vicinity of the premises, who personally visited the reduction works and knew that the work was being done and improvements being made · is *prima facie* sufficient to charge the owner with knowledge of that fact.

IDEM—LEASE.—*Held*, that the terms of the lease, as stated in the opinion, also, showed knowledge on the part of the owner.

IDEM—LABORERS—MATERIALS.—Persons performing labor, or furnishing materials used, in operating and "carrying on" reduction works are entitled to a lien against the property. (LEONARD, J., dissenting in part.)

IDEM—SECTION 19 OF LIEN LAW CONSTRUED—WORDS "OR" AND "ON"—CLERICAL MISTAKE.—In construing section 19 of the lien law (Stat. 1875, 126): *Held*, that the word "on" should be read "or;" that the change of the word "or" to "on," in the statute, was a clerical mistake and should be disregarded.

CONSTRUCTION OF ACT—JUDICIAL AND LEGISLATIVE.—A re-enactment of a statute, without substantial alteration, after an authoritative construction by the courts (in this case by the district court of U. S.) is a legislative adoption of the court's construction.

MECHANIC'S LIEN—LAND NECESSARY FOR CONVENIENT USE OF REDUCTION WORKS—EVIDENCE.—Testimony showing that the land and reduction works had been leased together, and sold together, tends to prove that the property subjected to the liens has been treated as a unit and used for a common purpose, and, in the absence of any other testimony, or objections, at the trial, the court has the right to infer that the land so used and treated was reasonably convenient for the use of the reduction works.

APPEAL from the District Court of the Fourth Judicial District, Humboldt County.

The facts sufficiently appear in the opinion.

· *Dickson & Varian* for Appellant :

I. The act of 1875 gives no lien to the plaintiff for the material of the machinery or castings furnished. The clear and unmistakable declaration in section nineteen is to the effect that only persons performing work or labor *on* the machinery, etc., shall have a lien. It is also plain, that no lien is given to laborers for the *carrying on* of the mill.

II. The right of lien is founded upon contract. There must be a contract, express or implied, before a right of lien attaches. In this case the lessee of the term of years was one of the contracting parties, and the lien claimants the other. In no sense was the lessee the owner's agent.

He himself was the owner in the sense of the statute. (Phill. Mech. L., sec 83, *et seq.; Harman* v. *Allen,* 11 Geo. 45; *Collins* v. *Mott,* 45 Mo. 100; *Francis* v. *Sayles,* 101 Mass. 435; *Lister* v. *Lobley,* 36 Eng. C. L. 435; *Ombony* v. *Jones,* 21 Barb. 520; *Choteau* v. *Thompson,* 2 Ohio St. 114; *Dutro* v. *Wilson,* 4 Ohio St. 101; *Johnson* v. *Dewey,* 36 Cal. 623; *Mumford* v. *Brown,* 6 Cow. 475.) The lessee cannot bind the reversion nor improve the tenant in fee out of his property. (*Alley* v. *Lanier,* 1 Cold. (Tenn.) 540; *Caldwell Institute* v. *Young,* 2 Duv. (Ky.) 582; *Lynam* v. *King,* 9 Ind. 3; *Haworth* v. *Wallace,* 14 Penn. St. 118; *Gaule* v. *Bilyeau,* 25 Penn. St. 521; *Squires* v. *Fithian,* 27 Mo. 134; 13 Ind. 475; *Knapp* v. *Brown,* 11 Abb. Pr. (N. S.) 118; *Kirk* v. *Taliaferro,* 8 Sm. & M. (Miss.) 754; *McCartey* v. *Carter,* 49 Ill. 53; *Leiby* v. *Wilson,* 40 Penn. St. 67; *McClintock* v. *Criswell,* 67 Penn. St. 183; Phill. Mech. L., sec. 186 *et seq.,* sec. 191.)

III. Torrey having covenanted to put the premises in repair, the relation between the Boca Mill Co. and him was simply that of owner and contractor, so far as the claim of plaintiff is involved, and he is not entitled to any lien upon the premises. If Torrey was a contractor, then plaintiff's lien must be given, if at all, by sections one and nineteen of the act. In discussing this statute the following authorities are cited upon the question of the construction of statutes with a view of arriving at the meaning of the term "agent" in section one. (*Harris* v. *Reynolds,* 13 Cal. 515; Bish. Writ. Laws, secs. 96, 242; *U. S.* v. *Magill,* 1 Wash. C. C. 463; *Adams* v. *Turrentine,* 8 Ire. 149; *State* v. *Smith,* 5 Hump. 396; *Ex parte Vincent,* 26 Ala. 145; *Macey* v. *Raymond,* 9 Pick. 285; *Merchants' Bank* v. *Cook,* 4 Pick. 405; Potter's Dwar. on Stat. 199.) It is sufficiently established by the foregoing authorities that, unless there is something upon the face of this statute from which it manifestly appears that the term "agent" as used in the latter clause of the section under discussion, was not intended to be used in its legal signification, the force and meaning thereof is that which it had previously acquired in the law.

The power of this statutory agent, by his acts, to bind or affect his principal, the owner, must be determined by those well settled legal rules and principles which define the rights and liabilities of principal and agent; some of the most elementary of which are that the principal is only bound by those acts or contracts made or performed by the agent, which are within the scope of his authority. If the agent transcend his powers the principal is not held; and third persons dealing with an agent must take notice of the extent of his authority. (Stor. on Agency, secs. 67, 71, 164, 176; *Blum* v. *Robertson,* 24 Cal. 128; *Boston Iron Co.* v. *Hale,* 8 N. H. 363; *Town* v. *Hendee,* 27 Vt. 258; *Taft* v. *Baker,* 100 Mass. 68, 75; *Sprague* v. *Gillett,* 9 Met. 91; 1 Chit. on Cont. 287.) The power conferred upon the statutory agent enables third persons who supply him with materials to be used in the execution of his contract, or who labor for him therein, to charge the property of his principal, the owner, with a lien therefor to the extent of the amount *to become due* to him from his principal on the *principal* contract, at the time he, the agent, purchases the material, or employed the labor. If not so limited, the statute in question leads to injustice. A construction which leads to injustice is to be avoided, if possible.

IV. Whatever may be said of the right to a lien against the property of the owner for the value of the work done in repairing a mill, &c., under a contract between the lien claimant and the original contractor, it is safe to say that there is nothing in the statute to indicate that the legislature intended to give a lien against the property of the owner, for the value of labor done in running and carrying on a mill, under a contract of employment between the lien claimant and the lessee of the owner.

V. No lien is given by statute upon the land on which the mill is situated for work done in carrying on the mill by the lessee.

VI. There was no evidence from which the court could determine how much of the land on which the buildings are situated was necessary for the convenient use and occupa-

tion thereof. The court, we say, cannot make a determination thereof unless there be some evidence upon which to base its determination. (*Lothian* v. *Wood*, 55 Cal. 159.)

VII. There was no evidence, in any view, that notice had been brought home to the Mill Company. The agency of Osborn had no relation to the management and control of the property leased, which had passed beyond the control and dominion of the owners. He was not acting in regard to it, and any knowledge that he may have acquired, was not the knowledge of his principal. (*Lothian* v. *Wood*, 55 Cal. 159.)

*A. C. Ellis*, for Respondent:

I. There is no ambiguity in the language employed in section 19 of the lien law as to the intention of the legislature to give a lien to the class of material men enumerated for furnishing machinery and castings as well as for labor expended on the same. But even if the legislature had failed to clearly express its intention by the language used in the particular section in question, this court will not confine itself to a consideration of one section of the act, but will consider all the sections together, if necessary, in order to determine what the intention of the legislature was. (*Burnham* v. *Hayes*, 3 Cal. 115; *San Francisco* v. *Hazen*, 5 Id. 169; *Taylor* v. *Palmer*, 31 Id. 240; *Cullerton* v. *Mead*, 22 Id. 98; *People* v. *White*, 34 Id. 183; *Murray* v. *Cent. R. R. Co.*, 3 Abb. Ap. 339.)

II. The owner having full knowledge that the repairs were being made upon the works, the law presumes that it was willing to allow the repairs to be made, and having done this, its interest in the property was subject to these liens. (*Fuquay* v. *Stickney*, 41 Cal. 586; *Phelps* v. *M. C. G. M. Co.*, 49 Id. 337.)

III. The court below was justified in giving a lien on the whole of the land in favor of the lien claimants. (*Dickson* v. *Corbett*, 11 Nev. 277.)

By the Court, BELKNAP, J.:

Foreclosure of mechanics' liens. The Boca Mill Company,

a corporation, was the owner of reduction works, and the land upon which they are situated. One Torrey entered into the possession of the premises under a written lease, duly recorded, for the term of two years. During Torrey's term the plaintiff and intervenors furnished materials and labor which were used in repairing and "carrying on" the mill. This suit is brought against defendant, as the successor in interest of the Boca Mill Company to the property, to enforce lien claims for the materials and labor so furnished.

The first question presented is whether Torrey, the lessee, could create a lien upon the premises that would affect the estate of the lessor. Section 1 of the lien law provides that "every person performing labor upon or furnishing materials * * * to be used in the construction, alteration, or repair of any building, * * * has a lien upon the same for the work or labor done, or materials furnished, by each respectively, whether done or furnished at the instance of the owner of the building or his agent; and every contractor, sub-contractor, architect, builder, or other persons * * * having charge of the construction, alteration, or repairs, either in whole or in part, of any building, or other improvement as aforesaid, shall be held to be the agent of the owner for the purposes of this chapter." (Stat. 1875, 122.) It may be conceded for the purposes of this case that to authorize a lien there must be an employment by the owner of the building, or his authorized agent, and that an employment by a lessee does not constitute the employment contemplated by the statute; and, further, that to constitute the contractor, sub-contractor, architect, builder, or other person the statutory agent of the owner, such person must have been employed, directly or indirectly, at the instance of the owner, or his conventional agent. But the interest of the owner may be subjected to lien claims, notwithstanding the labor and materials have not been furnished at his instance, if, knowing that alterations or repairs are being made or are contemplated, he fail to give notice that he will not be responsible therefor, as provided

in section nine of the act. The provision is as follows:

"Sec. 9. Every building or other improvement mentioned in section one of this act, constructed upon any lands, with the knowledge of the owner or the person having or claiming any interest therein, shall be held to have been constructed at the instance of such owner or person having or claiming any interest therein, and the interest owned or claimed shall be subject to any lien filed in accordance with the provisions of this chapter, unless such owner or person having or claiming an interest therein shall, within three days after he shall have obtained knowledge of the construction, alteration, or repair, or the intended construction, alteration, or repair, give notice that he will not be responsible for the same, by posting a notice in writing to that effect in some conspicuous place upon said land, or upon the building or other improvement situate thereon."

The evidence showed that the corporation had an agent residing in the vicinity of the premises, who personally visited the reduction works and knew that the work was being done and the improvements made. This evidence was *prima facie* sufficient to charge the corporation with knowledge of the fact. No notice having been given by it that it would not be responsible for the materials and work, it results from the provisions of this section that its estate is chargeable with the liens.

Again, the consideration for the lease was that the lessee, "at his own cost and expense, * * * make all necessary repairs and improvements in and about said mill and reduction works, and furnish all necessary materials to place the same in good condition for crushing," etc. The money so used, together with that expended in paying taxes and insurance, the lease provides, "shall be in full payment and satisfaction for the rent of said premises for the first year." This of itself shows knowledge on the part of the corporation of the "intended construction, alteration, or repair," within the meaning of section 9.

A question growing out of the provisions of this section is whether persons performing labor in operating the mill

can acquire a lien against the estate of the lessor. Section nineteen, as will be hereafter shown, provides liens for labor performed in "carrying on" mills, manufactories, and hoisting works, and declares that all of the provisions of the lien law respecting the mode of filing, recording, securing, and enforcing liens shall be applicable to the provisions of this section. The provisions of the lien law preceding section nineteen were, with two exceptions, immaterial to this case, enacted with reference to liens for work done or materials furnished in the construction, alteration, or repair of buildings. In extending the right of lien to a new class, it was natural for the legislature to ordain that the general rules governing liens should also be extended. And in section nineteen these general provisions were made applicable in so far as they are appropriate to the new subject of lien. This conclusion is warranted by the phraseology of the statute, and by the presumed intention of the legislature, to create an harmonious and not an incongruous law.

The question also arises whether the law, as it now stands, contemplates lien-claims for work performed in "carrying on" reduction works. At the session of the legislature of 1869 the following supplement was made to the mechanic's lien law :

"All foundrymen and boiler-makers, and all other persons performing labor, or furnishing machinery, or boilers, or castings, or other 'material, for the construction, or repairing, or carrying on of any mill, manufactory, or hoisting works, shall have a lien on such mill, manufactory or hoisting works, for such work or labor done, or *for* such machinery, or boilers, or castings, or other material furnished by each respectively." (Stat. 1869, p. 61.)

At the next session the lien law underwent some alterations, but this section was re-enacted without change, save that the italicised word "for" was omitted. The employment of this word in the original enactment was unnecessary, and its omission worked no other alteration in the law.

The supplemental law provides for two classes of lien claimants. One class consists of foundrymen, boiler-makers,

and persons furnishing machinery, boilers, castings, or other materials. The other class consists of persons performing labor. Down to the time of its enactment persons performing labor or furnishing materials for the purpose of operating mills, manufactories, or hoisting works were not entitled to liens under the lien law. The only object of the provision was to extend the right of lien to this class of claimants. Foundrymen, boiler-makers, and others furnishing labor or materials in constructing or repairing were already secured in their right of lien by the provisions of section 1 of the lien law, and the provisions of the supplemental law did not confer upon them additional rights.

In the year 1875 the law was again revised, and the revision constitutes our present law. The section under consideration was then re-enacted without change other than this:` The italicized word "on" in the following quotation was inserted in lieu of the word "or" in the original enactment. The section as changed stands as follows:

"Sec. 19. All foundrymen and` boiler-makers, and all persons performing labor, or furnishing machinery or boilers, or castings, or other materials for the construction, or repairing, or carrying on of any mill, manufactory, or hoisting works, shall have a lien on such mill, manufactory, or hoisting works for such work or labor done *on* such machinery, or boiler, or castings, or other material furnished by each respectively.     *     *     *"     (Stat. 1875, 126.)

If this language be followed the right of lien is restricted to " work and labor done on such machinery, or boiler, or castings, or other materials " as the lien claimant may have furnished, and is withheld from persons furnishing labor without materials; and, also, from those furnishing the many articles of mining and milling supplies upon which no labor is bestowed by the vendor. The section, as it appears in the published statutes and in the enrolled bill, is delusive. It purports to provide for two distinct classes of lien claimants, but in fact provides for only one class. No reason can be assigned why the pretended provision for "persons

performing labor'' should have been nullified by the inconsistent provisions succeeding, nor for the senseless discrimination in favor of those laboring upon materials furnished by themselves, and against those laboring upon materials furnished by others. If the intention of the legislature had been to change the law, it is reasonable to presume that language fairly expressive of such intent would have been employed, and that so radical a change would not have been brought about by the simple changing of the word "or" to "on." Instead, however, of fairly expressing a change in the law, the phraseology of the statute, unless attributable to clerical mistake, is intentionally misleading. No intention to mislead can be indulged, and we conclude that the change arose through a clerical mistake, and should be disregarded. The error may be accounted for by the similarity in appearance of the words "or" and "on" as ordinarily written. By mistaking the former word for the latter the error doubtless originated.

The principle that courts will disregard clerical errors apparent upon the face of a legislative act has been frequently recognized. In *U. S.* v. *Stern*, 5 Blatchf. 513, the court had occasion to consider a statute providing for the indictment of persons convicted of bribery. If effect were given to the clause concerning convictions, the whole act would be rendered meaningless. In order to carry out the intention of congress the clause was disregarded.

A statute of the state of Minnesota, providing for the removal of actions to the supreme court, declared, by its first section, that "a judgment or order in a civil or criminal action in any of the district courts may be removed to the supreme court, as provided in this chapter." The second section was in these words : "All *penal* judgments in the district courts may be examined and affirmed, reversed or modified by the supreme court ;  *  *  *  such examination may be made upon writ of error or appeal as hereinafter provided." The court held that the manifest design of the statute was to subject all judgments of the district courts to examination by the supreme court; that the second

section contained the only provision touching the manner of removing judgments ; that if it were construed according to its letter, the whole statute would be rendered ineffectual ; that the substitution of the word "final" for the word "penal" would render the whole chapter effectual, and consistent with its intent and purpose, and thereupon the court concluded that the use of the word "penal" instead of the word "final" was a clerical or typographical error, and that the section should be treated as if the word "final" were substituted for the word "penal." (*Moody* v. *Stephenson,* 1 Minn. 401, (Gil. 289.) Decisions involving the same principle were made in the following cases : *Jenks* v. *Langdon,* 21 Ohio St. 370 ; *Turner* v. *State,* 40 Ala. 21 ; *Nazro* v. *Merchants' Ins. Co.* 14 Wis. 295 ; *Haney* v. *State,* 34 Ark. 268 ; *People* v. *Onondaga,* 16 Mich. 254 ; *Blanchard* v. *Sprague,* 3 Sumn. 279 ; *People* v. *Hoffman,* 97 Ill. 234 ; *McConkey* v. *Alameda Co.* 56 Cal. 83 ; *Frazier* v. *Gibson,* 7 Mo. 272.

The meaning attaching to the words " carrying on," as used in section 19, was construed by the district court of the United States for this district, in the year 1871, to the effect that a teamster, in hauling quartz to a mill, performed labor for carrying on the mill and was entitled to a lien against it. (*In re Hope M. Co.* 1 Saw. 710.) In 1875, as before stated, the legislature re-enacted the provision so construed. It has frequently been held that the re-enactment of a statute without substantial alteration, after an authoritative construction has been placed upon it, is a legislative adoption of the construction. The cases in which the rule is announced are generally those in which the construction has been given by the highest court of the state ; no case has fallen under our notice in which the construction was given to a statute of the state by the courts of the United States. The rule is based upon the presumption that the legislature knew of the construction.

In *Hunter* v. *Truckee Lodge,* 14 Nev. 39, this court felt safe in holding that before an official publication of a decision by the supreme court of California " there ought to be

no presumption that the decision was known to our legislature." "In frequent instances," says the court in that case, "the courts have taken pains to show, by comparison of dates and otherwise, that it was reasonable to presume that the previous construction of borrowed statutes was actually known to the legislature by which they were adopted; and in one case, *Campbell* v. *Quinlin,* 3 Scam. 289, some stress was laid upon the fact that the decisions had not only been made, but the 'reports published to the world' prior to the adoption of the statute in question."

The federal decision to which we have referred was published in the year 1873, in the reports of cases determined by the United States courts within the district embraced by the state of Nevada. If the presumption of knowledge on the part of the legislature is based upon the fact that publicity is given to the construction by publication of the decision, as this court appears to have held, we see no reason why the presumption of legislative adoption of the judicial construction of the statute in this case should not apply with the same force as in the cases decided by the state courts.

Again, courts frequently refer to the history of a statute, and to any circumstance evidencing its object, for the purpose of ascertaining the intention of the legislature. Such reference is based upon the presumption that legislatures are conversant with the subject matter upon which they are acting. The decision in the first of Sawyer's reports forms part of the history of the lien law, and it is reasonable and just to assume that in legislating upon the subject of mechanics liens it was not overlooked. Independently of these considerations, we are convinced that persons furnishing labor or materials used in operating the mill are entitled to liens, because, *first,* the language of the statute so declares; and, *second,* as stated in another portion of this opinion, the enactment of section 19 was unnecessary, unless its object was to extend the right of lien to these classes of claimants.

The last point made is that there was no testimony show-

ing how much of the land, upon which the reduction works stood, was necessary for its convenient use and occupation. When the reduction works were leased the land determined by the court as subject to the lien was embraced within the demised premises. And when the defendant acquired the property he purchased this land and the reduction works. This testimony showing that the land and reduction works had been leased together, and sold together, tends to prove that the property subjected to the liens has been treated as a unit and used for a common purpose. With this testimony the court, in the absence of any suggestion to the contrary, (and none was made at the trial) might properly have inferred that the land so used and treated was reasonably convenient for the use of the reduction works.

The judgment and order of the district court overruling the motion for new trial are affirmed.

Leonard, J., dissenting :

Whether or not any person has a lien on real property depends entirely upon the statute. Our statute, in the cases mentioned therein, only gives liens for labor performed and materials furnished at the instance of the owner or his agent. "Every contractor, sub-contractor, architect, builder, or other person having charge of any mining claim, or of the construction, alteration, or repairs of any building or other improvement," is an agent of the owner. A contractor is one who enters into a contract with the owner to perform labor or furnish materials, and is responsible to the owner ; a sub-contractor enters into a contract with the contractor and is responsible to the latter ; an "architect, builder, or other person" may have charge for the owner, contractor, or sub-contractor. There may be at the same time an owner of the fee and an owner for years, as there was in this case. (Phil. Mech. Liens, 151.) The plaintiff was a contractor with Torrey, the lessee, but not with defendant's grantor, the owner of the fee. Plaintiff was an agent of Torrey, but not of the Boca Mill Company, nor was Torrey the latter's agent. As agents of the Boca Mill Company,

neither plaintiff nor Torrey had power to burden the interest of the former with liens. Under section 1 of the lien law it is only upon contracts made with the owner or his agents named, that liens are allowed at all, and, without section 9, it is my opinion that Torrey's interest alone would have been subject to any liens filed in this case.

In Georgia the statute giving all persons employed on steamboats a lien thereon for wages, and for wood and provisions furnished, was so amended as to be applicable to all steam saw mills at or near any of the water-courses in the state, in behalf of all persons who might be employed *by the owner or owners, agent or superintendents*, for services rendered, or for timber or fire-wood of any description, provisions or supplies, delivered to any such steam saw-mill. The amendment also declared that the same course should be pursued for the recovery of any such claim, as was stated in the original act; *provided*, the demand for such claim should be first made to the owner or agents of any person having control of any steam saw-mill against which any proceedings might be had under the provisions of said act. (Cobb Dig. Ga. 1851, p. 428.) Construing that statute in *Harman* v. *Allen*, 11 Ga. 46, the court said:

"The lien given by the act of 1842, and the summary remedy provided for its enforcement, are in behalf of the persons who are employed by the owner, agent, or superintendent of the mills, or for services rendered, or for supplies of any description which may be furnished the mill. It is clear that the lessee is neither agent nor superintendent in contemplation of the statute. He must, therefore, be the owner of the property, or otherwise the act does not apply to him at all. But he is the qualified owner of the mills, and it was competent for him, as such, to bind the property for the unexpired term for which it was let. Beyond this he could not go. It would be intolerable to hold that he could create liens upon the reversion, *ad libitum*, for stocks and other materials consumed during his temporary occupancy. It has been contended that the words 'agent' and 'superintendent,' include those who, *de facto*, control the

property, irrespective of ownership. If so, then a mere trespasser or 'disseizor who wrongfully obtains the custody might incumber the estate with the most ruinous burdens. Such, we apprehend, could not have been the intention of the legislature. None but the rightful owner, his agent, or superintendent can exercise this power ; and, inasmuch as the tenant for the time being is the rightful owner, he may, by his contract, bind the property to the extent of his interest, but no further.''

In my judgment the court's reasoning in that case is sound, and it is applicable to this case under section one. See, also, *McCarty* v. *Carter*, 49 Ill. 57 ; Phil. Mech. Liens, 117.

But section 9 provides that "every building or other improvement mentioned in section 1, constructed upon any lands with the knowledge of the owner, or the person claiming an interest therein, shall be held to have been constructed at the instance of such owner or person claiming any interest therein, and the interest owned or claimed shall be subject to any lien filed in accordance with the provisions of this chapter, unless such owner or person having or claiming an interest therein shall, within three days after he shall have obtained knowledge of the construction, alteration, or repair, or the intended alteration, construction, or repair, give notice that he will not be responsible for the same, by posting a notice in writing to that effect in some conspicuous place upon said land or building or other improvement situate thereon.'' If defendant's grantor had knowledge through its agent of the *construction, alteration or repairs* made by Torrey, and did not post the required notice within the specified time, then, by the terms of the statute, the materials furnished by plaintiff and the labor performed in repairing or altering the mill must be held to have been furnished or performed at the instance of the Boca Mill Company, and, under section 1, as well as section 9, the interest of that company became burdened with liens for such materials and labor. But for the labor performed by intervenors in "carrying on the

mill,'' I do not think the statute, construed as an entirety, permits any interest beyond that of the lessee to be subjected to the liens.

Section nineteen of the existing lien law was enacted as an independent statute in 1869, and was embodied in the present law in 1875, when section nine was, for the first time, made a part of the law governing liens. I feel satisfied, as before stated, that without the aid of section nine even the plaintiff could not have subjected the interest of the Boca Mill Company to liens for materials furnished and labor performed for Torrey; and if I am right in this, then intervenors are not entitled to a lien upon that interest, for labor performed in "carrying on the mill," because section nine does not declare that *such labor* shall be held to have been performed at the instance of that company, unless it gave the notice required in case of construction, alteration, or repair.

Under section nine the Boca Mill Company was bound to give the required notice or have its property subjected to liens for machinery and materials furnished, and for labor performed under contract with Torrey, in constructing, altering, or repairing the mill. But for the labor performed in running the mill, no notice was required; and it cannot be said that the owner of the reversion was bound to give notice as to such labor, simply because it had to be given in the matter of materials furnished and labor performed in improving the mill. On the contrary, since the legislature, *ex industria,* limited the necessity of a notice to one class of claims, the presumption is that the other was not intended to be included.

Section 9 is a harsh law, and it should not be construed to mean more than was plainly intended by the legislature. If a mill is altered or repaired by a lessee, a lien may, with some reason, be given upon the interest of the lessor, unless he gives the notice required; for the value of the property may be, and probably will be, enhanced by the outlay. But before I can say the legislature intended to give a lien upon the mill of a lessor for work performed in

running it, under a contract with a lessee, and for his sole benefit, in other words, before I can say that the legislature intended to make a lessor's property liable for a lessee's debts, such intention must be so plainly expressed that no other construction is consistent with the language employed. In my opinion that intention nowhere appears in the statute under consideration.

It is provided in section 19, under which intervenors claim their lien, that "all the provisions of this act respecting the mode of filing, recording, securing, and enforcing the liens of contractors, journeymen, laborers, and others, * * * shall be applicable to this section of this act." That is to say, lien claimants, under section 19, shall pursue the same course in recovering their claims as is required of other lien claimants. I am of opinion, also, that under section 3 of the lien law the liens of intervenors cannot attach to any interest in the land occupied by the mill except Torrey's.

To the extent stated I dissent.